United States District Court
Southern District of Texas

**ENTERED**

February 11, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANITA WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-15-84 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 21), and Defendant's Cross Motion for Summary Judgment (Document No. 26) and Response to Plaintiff's Motion for Summary Judgment (Document No. 27). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No.26) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 21) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on April 24, 2015. (Document No. 11).

I. **Introduction**

I. **Introduction**

Plaintiff, Anita Williams ("Williams") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for supplemental security income ("SSI"). Williams argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Mark Dowd, committed errors of law when he found that Williams was not disabled. Williams argues that she has been disabled since June 7, 2011. According to Williams, the ALJ erred in his residual functional capacity assessment. Williams further argues that the ALJ relied on flawed vocational expert testimony because it was premised on the ALJ's residual functional capacity (RFC) finding that was not supported by the record. Williams seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Williams was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

II. **Administrative Proceedings**

On December 9, 2011, Williams protectively filed an application for SSI claiming she has been disabled since June 7, 2011. (Tr. 169-173). The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 82-88, 91-93). Williams then requested a hearing before an ALJ. (Tr. 94). The Social Security Administration granted her request, and the ALJ held a hearing on June 20, 2013. (Tr. 28-73). On October 24, 2013, the ALJ issued his decision finding Williams not disabled. (Tr. 8-27).

Williams sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 7). The

Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence.  After considering Williams's contentions in light of the applicable regulations and evidence, the Appeals Council, on October 23, 2014, concluded that there was no basis upon which to grant Williams's request for review.  (Tr. 1-6).  The ALJ's findings and decision thus became final.

Williams has timely filed her appeal of the ALJ's decision.  The Commissioner has filed a Motion for Summary Judgment (Document No. 26).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 21).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 850.  (Document No. 8).  There is no dispute as to the facts contained therein.


### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards."  *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing"

when not supported by substantial evidence.  *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If  the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his October 24, 2013, decision that Williams was not disabled at step five. In particular, the ALJ determined that Williams had not engaged in substantial gainful activity since December 9, 2011 (step one); that Williams's status post cerebrovascular accident, hypertension, mood disorder and some cognitive disorder, not otherwise specified (NOS) secondary to her cerebrovascular accident were severe impairments (step two); that Williams did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the record, and the testimony of Williams, Williams had the residual functional capacity ("RFC") to perform light work except that she "is further limited to simple routine, and repetitive tasks, performed in a work environment free of fast past production requirements, involving only simple work-related decisions and with few if any, work place changes." (Tr.19). The ALJ further found that Williams was unable to perform any past relevant work (step four); and that based on Williams's RFC, age, education, work experience, and the testimony of a vocational expert, that Williams could perform jobs that exist in significant numbers in the national economy such as an usher, information clerk, and ticket taker, and that Williams was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as

testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V.  Discussion

The objective medical evidence shows that Williams has hypertension and has had two strokes. Following the first stroke, Williams has complained of and been treated for left sided weakness and speech difficulties.

The record shows that Williams was hospitalized at the West Houston Medical Center from June 8, 2011 through June 10, 2011. (Tr. 263-280, 739-850). Williams called an ambulance to take her for medical attention because she got tired of feeling exhausted. Williams reported weakness in her lower left extremities and impaired speech. (Tr. 741). An MRI of the brain revealed chronic ischemic changes coupled with age-appropriate involutional change. (Tr.783). The results of a speech/language evaluation showed that Williams was able to answer a variety of questions, follow directions, and her problem solving skills were within normal limits. The evaluator noted slurred speech in conversation and diagnosed mild dysarthria. (Tr. 795). Following a speech therapy session, Williams's speech was described as "clear and intelligible." (Tr. 796).

Following her stroke, Williams was seen August 6, 2011, for medication refills. (Tr. 283-287). The records further show that Williams was seen by Dr. Rode on December 6, 2011. (Tr. 381-385, 442-447). Williams's blood pressure was 160/124. (Tr. 443). The treatment note reveals that "pt taking hypertensive medications compliantly without side effects." (Tr. 442). Williams was next seen by Dr. Rode on January 17, 2012. (Tr. 373-380, 434-441). Her blood pressure was 127/88. (Tr. 435). Williams reported that she was "doing all things right" and reported no side effects from medications.

Williams was referred to Alan E. Cororve M.D. for a consultative physical examination. The

examination took place on February 27, 2012.  (Tr. 292-294).  Dr. Corove identified Williams's chief complaints as hypertension, stroke and shortness of breath.  Williams's blood pressure was 122/83.  Dr. Corove wrote that Williams had a full range of motion of all joints examined in the upper and lower extremities using active and passive exercises and all would be graded 4/4. Muscular strength was normal and equal in all muscles tested in the upper and lower extremities and would be graded 4/4.  Handgrip was 4/4 bilaterally.  The patient had a normal gait without evidence of a limp.  Based on his examination and review of a normal chest x-ray, Dr. Cororve opined:

> Ms. Williams suffers from hypertension which appears to be controlled.  She has recovered fairly well from her stroke since June of last year and has good insight and is adjusting to any current limitations.  I am not sure as to the etiology of her shortness of breath and believe this needs to be worked up.  (Tr. 293).

On March 8, 2012, Kim Rowlands, M.D., a disability determination unit physician completed a Physical Residual Functional Capacity Assessment.  (Tr. 295-302).  Dr. Rowlands opined that Williams had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  Dr. Rowlands further opined that Williams could occasionally lift and/or carry 50 pounds, frequently lift and /or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour work day, sit (with normal breaks) for a total of about 6 hours, and was unlimited in pushing/pulling.

At a follow-up appointment on March 28, 2012 (Tr.347-388,  424-432), Williams reported that she "was told not to take blood pressure medication by sister, so stopped taking her medication at that time" and had not taken blood pressure medications since March 17.  (Tr. 425-426).  Her blood pressure was 200/107.  Williams reported that she passed out at dinner.  Williams was re-started on her blood pressure medications.

Williams fell at WalMart and was transported to North Cypress Medical Center Emergency

Room.  A CT scan of the head was negative and she was discharged with a diagnosis of dizziness. (Tr. 303-316).   On March 30, 2012, Williams underwent a Stationary ECG Study.  (Tr. 422-423).

Williams was seen by Dr. Rode on May 14, 2012.  (Tr. 336-343, 414-421).  Again, Williams reported that "she has been doing all things right.  She is using her patch, taking her medications." (Tr. 414).  Williams reported that she stopped talking her medication for a week when she went to the hospital for an episode of passing out in March 2012.  (Tr. 414).  She also reported getting tired when she walks a long distance. The examination shows that Williams's blood pressure was 136/100; she was alert, coordination normal, and motor strength 4/5 in both lower extremities; and 5/5 in upper extremities.  (Tr. 415).  Williams left without being seen by Dr. Rode on July 17, 2012. (Tr. 411-413). Williams returned on August 15, 2012, for medication refills and blood pressure reading.  (Tr.328-335,  403-409).  The nurse practitioner noted that Williams exhibited abnormal muscle tone (left sided weakness) and an abnormal (slow) gait.  She was seen by Dr. Rode on September 17, 2012.  (Tr. 318-327, 386393-402).  Williams reported dizzy spells when she gets up suddenly.  Williams's coordination was described as "abnormal" with an increased tone of the left upper extremity and lower left extremity, DTF 3+ on left side, and unsteady gait.  (Tr. 394).  Dr. Rode noted motor strength of 4/5 on the left upper extremity and 5/5 on the ride.  Dr. Rode referred Williams to a social worker for assistance in getting a cane, food stamps and poor cognition.  She was also referred to neurology for a CT of the head.  On October 1, 2012, Williams had the CT head. No acute abnormalities were noted .  (Tr. 390-392).  Williams was treated by a Nurse Practitioner on February 7, 2013.  (Tr. 531-537).  The treatment notes reveal a blood pressure reading of 154/117 (Tr. 532), her strength in both upper extremities was 5/5 and 4/5 in left lower extremity.  The examination was positive for expressive aphasia.  Williams was seen at the neurology clinic on February 14, 2013 (Tr. 667-672), and by the nurse practitioner the following day.  (Tr. 525-530).

The notes from both visits are unremarkable.  At Williams's March 2, 2013, follow-up appointment with the Nurse Practitioner, an additional medication, Metroprotol was added to counter dizziness. She was diagnosed with diastolic dysfunction.  (Tr. 519-524).  She returned on March 22, 2013, and stated that "she feels great today and does not feel dizzy anymore."  (Tr. 539-544).  Williams had a follow-up appointment at the Neurology Clinic on May 13, 2013.  (Tr. 552-560).  Because Williams has orthostatic lightheadedness, she was instructed to stand up slowly.  Examination findings show that no abnormalties were noted in speech and language.  No abnormalities were noted in her upper and lower extremities or gait.  The neurologist reviewed results of a head CT, which showed small changes.  (Tr. 555).  Williams returned on May 14, 2013.  (Tr. 566-572).  She was seen by Dr. Kamal Wagle.  The progress note reveals a blood pressure of 129/102.  (Tr. 567).

Williams was transported to the Park Plaza Hospital Emergency Room by the Houston Fire Department on June 2, 2013.  (Tr. 580-595).  Williams has fainted at church.  The results of her examination were normal and her symptoms improved.  Williams requested she be placed back on seizure medicine.  The discharge diagnosis was near syncope.

On July 1, 2013, Williams was seen by Dr. Wagle for medication refills.  (Tr. 623-630).  She reported her June 2, 2013, fall at church .  Dr. Wagle noted that Williams had run out of dilantin two weeks ago and a blood pressure medicine three weeks ago.  Dr. Wagle wrote that Williams experienced no dizziness or passing out when on prescribed medications.  Williams had a follow-up visit on July 5, 2013 with the Nurse Practitioner.  Her blood pressure was 163/128.  (Tr. 615-622). She returned for a scheduled appointment on July 23, 2013.  (Tr. 608-614).  The treatment note reveals a blood pressure reading of 148/88 and normal reflexes.  Williams reported adhering to a low sodium diet on August 13, 2013.  The Physician Assistant noted that her blood pressure was "at goal" (Tr. 633) and she had a "+ aphasia.  (Tr. 632-638).  Williams was seen again on November 7,

2013 (Tr. 647-648) and on December 12, 2013. (Tr. 641-646). Dr. David Hunter wrote that her gait was normal and that her headache complaints were likely tension headaches. He further noted that Williams's "dizziness only occurs when she stands up with sudden onset."

The record shows that Williams was referred for physical therapy. The first session she attended was on January 24, 2012. (Tr. 370-371). Her prognosis was described as "good" especially since Williams was highly motivated. Goals of therapy were lower left extremity strengthening, balance/gait training, coordination, and to return to running. The records show she attended physical therapy on January 31, 2012 (Tr. 368-369), February 10, 2012 (Tr. 366-367), February 20, 2012 (Tr. 364-365), March 8, 2012 (Tr. 360-361), March 21, 2012 (Tr. 357-359), March 30, 2012 (Tr. 334-335), October 26, 2012 (Tr. 721-722), November 2, 2012 (Tr. 718-720); November 9, 2012 (Tr. 715-717), November 16, 2012 (Tr. 713-714), November 30, 2012 (Tr. 710-712) and December 14, 2912 (696-697). Overall the treatment notes show that Williams was compliant with practicing the exercises at home and improved her balance. (Tr. 719, 714, 710-712). Williams also required constant re-direction away from hyper focusing on inabilities and needed encouragement to focus on abilities. (Tr. 714). Notes from the December 14, 2012, session show that Williams was able to run, jump, and could run 200 feet. (Tr. 696-697).

The record shows that Williams also regularly attended speech therapy sessions with Traci B. Kurkowski, a speech language pathologist. She attended sessions on October 30, 2012 (Tr. 734-736), November 6, 2012 (Tr. 731-733), November 13, 2012 (Tr. 729-730), November 20, 2012 (Tr. 726-727), November 27, 2012 (Tr. 723-724), December 4, 2012 (Tr. 707-708), December 11, 2012 (Tr. 704-706), December 18, 2012 (700-703), January 8, 2013 (Tr. 693-995), January 15, 2013 (Tr. 690-692, 698-699), January 29, 2013 (Tr. 687-689), February 5, 2013 (Tr. 685-686), February 12, 2013 (682-684), February 19, 2013 (Tr. 681), February 26, 2013 (Tr. 677-679), March 5, 2013 (Tr.

675-676), April 2, 2013 (Tr. 549-550, 662-664), April 9, 2013 (Tr. 548-659-661), April 23, 2013 (Tr. 546-547, 654-656), April 30, 2013 (Tr. 651-653), May 14, 2013 (Tr. 563-564), May 21, 2013 (Tr. 561-562), and June 4, 2013 (Tr. 649-650).  The treatment notes show that Williams was eager and motivated to attend therapy and made progress.  Williams exhibited "mild cognitive-linguistic deficits and neurogenic stuttering and the fluency gets better when she slows down.  (Tr. 700-703) and that "Pt continues to exhibit mild cognitive deficits in the domain of executive functioning"(Tr. 549-550, 662-664, 563-564.)  The treatment notes reveal that Williams had difficulty in any complex area.  For example, on January 15, 2013, the speech pathologist noted that Williams "requires minimal assistance to generate multiple solutions and to comprehend complex information."  Further, on February 12, 2013, that Williams "does require rare minimal cueing/assistance and additional time to complete complex problem solving tasks."  Or on April 9, 2013, that "most difficulty observed with understand complex transactions."  (Tr. 548-661) & April 23, 2013 (Tr. 546-547, 654-656).  On May 21, 2013, the treatment note states that "when racing against each other, pt performed task with 70% accuracy.  When taking turns 100% accuracy."  (Tr. 561-562).

Williams was referred for a psychological examination by the ALJ.  On July 18, 2013, Lindsay Rosin, Ph.D, evaluated Williams. (Tr. 597-602).   In connection with the examination, Dr. Rosin reviewed the most recent medical records from Park Plaza Emergency Room dated June 2, 2013, and from the Neurology Clinic on May 23, 2013.  According to Dr. Rosin, Williams's primary complaint was depression.  Williams reported that she becomes aggravated very easily and gets upset when she stutters, and prefers to be alone.  The results of the mental status examination reveal:

> **Appearance and Behavior:**  The claimant was casually dressed and groomed, and appeared older than her stated age.  Gait was slow and mildly unsteady.  Motor activity was below average.  She displayed good eye contact and engaged in spontaneous conversation with this examiner

.

**Stream of Speech and Mental Activity:**  Speech was intelligible over 95% of the time and was characterized by numerous instances of stuttering and mildly slurred speech.

**Mood and Affect:**  Mood appeared anxious and affect was congruent with mood. She says she feels "sort of" depressed when meeeting new people and added that interacting with people aggravates her.  She said the last time she cried was 2 years ago and that she had cried frequently following her stroke.  She became tearful for a minute at one point during this interview. She acknowledges occasional feelings of helplessness but denies feelings of hopelessness, worthlessness, and guilt.

**Thought Process:**  Thought processes appeared clear, coherent, and goal directed.

**Content of Thought:**  She denies any suicidal ideation or intentions and denies any past suicide attempts.   The denies any delusional thinking, hallucinations, or homicidal ideation.

**Sleep and Appetite:**  She reports no problems with her sleep with current medications and reports no problems with her appetite.  She reports no changes in her weight.

**Proverb, Interpretation:**  Abstraction ability was fair.  For example, when asked to interpret "Strike while the iron is hot," she responded "now is the time to get it." (Tr. 598-599).

Dr. Rosin also administered the WAIS-IV, which revealed a Full Scale IQ of 70, Verbal Comprehension Index Score of 81, Perceptual Reasoning Index Score of 75, Working Memory Index Score of 74, and Processing Speed Index Score of 62.  With respect to Williams's activities of daily functioning (Tr. 600-601), Dr. Rosin wrote:

**Activities of Daily Living:**  The claimant has lived with her 58-year-old sister in the sister's 1 bedroom apartment for the past month.  She said she was previously homeless for 8 months and lived with various friends at their residences prior to that. The claimant says she is able to feed, bathe, and dress herself independently but is markedly slower in performing these functions since the CVA.  Her household chores at her sister's apartment include brief instances of light cleaning.  She spends her day at home watching soap operas on television and reading mystery books.  She says she likes to read books by John Patterson and Stephen King.  The claimant does not have a driver's license.  She says she can ride a city bus independently on short routes only. She is able to tell time using an analog clock.  She can slowly count small amounts of money and slowly make correct change.  She says she can make a few purchases at the grocery store.  She states she is able to stand for up to 5 minutes at a time and

can walk up to 2 blocks at a time.  The claimant says she has no close friends since
suffering the CVA in 2012.  She said she had a few friends prior to that time but says
she has "always been a loner."  When asked what she does for fun, she responded
"stay by myself."  The claimant says she is able to operate a microwave, cook simple
meals, wash dishes, and do basic laundry tasks independently.  She says she reads
newspapers and watches television new programs.  She could describe 1 current event
in vague detail.  She attends church services on a weekly basis with her older sister.

Overall, Dr. Rosin diagnosed Williams with a mood disorder due to CVA and cognitive disorder.

Williams had a GAF of 50, which indicates serious impairment in social and occupational

functioning.  Based on this, Dr. Rosin opined that the prognosis was good for mood complaints but

guarded as related to intellectual and cognitive abilities.  (Tr. 601).

The record further reflects that Dr. Rosin completed a form "Medical Source Statement of

Ability to do Work-Related Activities (Mental) on July 18, 2013.  (Tr. 603-605).  Using a scale

ranging from none, mild, moderate, marked and extreme, Dr. Rosin opined that Williams's had no

limitations in the ability to make judgments on simple-work-related decisions, that she had mild

limitations in the ability to understand and remember simple instructions, and carry out simple

instructions.  Williams had moderate limitations in the ability to make judgments on complex work-

related decisions. In two areas, Dr. Rosin opined that Williams had marked limitations in the ability

to understand and remember complex instructions and carry out complex instructions.

With respect to Williams's ability to interact appropriately with supervisors, co-workers, and

the public, and ability to respond to changes in a routing work setting, Dr. Rosin opined that Williams

had moderate limitations in the ability to interact appropriately with the public, interact appropriately

with supervisors and interact appropriately with co-workers.  In one area, the ability to respond

appropriately to usual work situations and to changes in a routine work setting, Dr. Rosin opined that

Williams had marked limitations.  (Tr. 604).

Williams completed a Function Report. (Tr. 205-211). Williams identified left side weakness

and not being able to stand up for long periods of time as her primary health concern.  (Tr. 205).  As for daily activities, Williams wrote that she gets up and takes her medicine and lays back down.  She further stated she has no trouble preparing meals or with grooming.  (Tr. 206).  As for hobbies, Williams wrote that she watches television and used to read.  (Tr. 209).  She does not like being around other people because of the way she talks but added that she goes to church as often as she can.  (Tr. 209).  Williams denied any problems with attention, following written or oral instructions or getting along with authority figures.  (Tr. 210).  She noted that she does not handle stress well.  (Tr. 211).  As for limitations, she stated that following her stroke, she has problems lifting, standing, walking and talking.  (Tr. 210).

Here, substantial evidence supports the ALJ's finding that Williams's status post cerebrovascular accident, hypertension, mood disorder, some cognitive disorder, not otherwise specified (NOS) secondary to her cerebrovascular accident were were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment.

RFC is what an individual can still do despite her limitations.  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996).  The responsibility for determining a claimant's RFC is with the ALJ.  *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).  Here, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed Williams's physical and mental impairments. The ALJ's RFC determination  is consistent with the record as a whole.  With respect to the well documented left sided weakness, the ALJ limited Williams to

occasional reaching with the upper extremity.  As for mental limitations, the ALJ limited Williams to simple routine, and repetitive tasks, performed in a work environment free of fast past production requirements, involving only simple work-related decisions and with few if any, work place changes. Williams argues that ALJ failed to accommodate Dr. Rosin's findings in the area of social functioning, namely that Williams has marked limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting in the RFC determination. The Commissioner responds that the ALJ considered Dr. Rosin's report, as well as Williams's testimony and the treating records from the speech and language pathologist in formulating the RFC.  The ALJ, based on the totality of the evidence, incorporated limitations he found supported by the record, and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."  *Newton*, 209 F.3d at 455.  The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown.  *Id*. at 455-56.  The Fifth Circuit in *Newton*  described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or in otherwise unsupported by the evidence.  *Id*. at 456.  "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views

under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453.  The six factors that must be

considered by the ALJ before giving less than controlling weight to the opinion of a treating source

are:  (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of

the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence

of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of

the source.  20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456.  An ALJ does not have to consider

the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual

matter that one doctor's opinion is more well-founded than another," and were the ALJ weighs the

treating physician's opinion on disability against the medical opinion of other physicians who have

treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458;

*Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003).  Further, regardless of the

opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a

claimant's disability status." *Martinez*, 64 F.3d at 176.  "The ALJ's decision must stand or fall with

the reasons set forth in the ALL's decision, as adopted by the Appeals Council." *Id.* at 455; *see also*

*Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm

the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection

in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.

1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical

records and testimony, and that his determination reflects those findings accurately.  The ALJ

summarized the evidence and set forth specific reasons concerning the weight given to the opinions

of the medical sources.

With respect to the opinions and diagnoses of treating physicians and medical sources, the

ALJ wrote:

> As for the opinion evidence, the undersigned considered the medical opinions of the state agency medical examiners who concluded that the claimant retained the residual functional capacity for at least a medium range of physical activity (Exhibits 4F and 6F).  However, in light of additional medical evidence submitted for consideration since these assessments as well as considering the claimant's subjective allegations, the undersigned finds that a limited range of light work activity as described above is appropriate.  No assessment of the claimant's mental residual functional capacity was made at either the initial or reconsideration levels of review.  However, in light of the hearing testimony and the July 2013 psychological examination findings, the undersigned finds that a mental residual functional capacity for simple work free of production requirement and with few if any work place changes is appropriate.  (Tr. 20).

Upon this record, the ALJ's decision is a fair summary and characterization of the medical records. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480

(5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Williams testified about her health and its impact on her daily activities.  She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. Williams testified that her health problems started in June 2011 with the first stroke.  She did not immediately seek medical care because she was determined to get better without help.  (Tr. 38).  Following the stroke, she had left sided weakness.  (Tr. 38-39).  Williams stated that she had difficulty lifting things and walked with a limp.  (Tr. 39).  In addition to the left sided weakness, Williams testified about experiencing slurred speech. (Tr. 39).  Williams further testified that she fell down stairs in November 2011 but did not hurt herself.  (Tr. 39-40).  She also testified about hitting her head at a grocery store and passing out at church.  (Tr. 40, 43-45).  Williams reported that she diligently takes her medication.  (Tr. 46-47).  With respect to her abilities, Williams reported that she gets aggravated if rushed.  (Tr. 48-50).  Williams stated that she does not run because she might fall and has difficulty going down stairs.  (Tr. 50-51).  She also noted that she has limited use of her left arm but no problems with her right arm.  (Tr. 51-52).  As for walking, Williams testified that she can walk a mile and a half in forty-five minutes.  (Tr. 52).  Williams reported that she has some limitation in executive functioning, i.e, decision making, and processing information.  (Tr. 54, 59-60).  Williams testified that she will say it in her mind but it comes out backwards.  (Tr. 55).  Williams testified that she likes to be alone.  She elaborated that she does not want to talk to people because of her speech impediment.  (Tr. 59).  Williams lives with her sister and her activities include going to church and

some housework. (Tr. 56). She denied wanting a cane or walker because "I'd rather be as normal as I possibly can." (Tr. 56-57). Williams stated that she sits on the floor with her back against something when she feels dizzy. She reported no dizziness when walking or standing. (Tr. 60-62). As for hobbies, Williams testified that she reads mysteries and suspense books and watches television. (Tr. 57). Side effects of her medication include drowsiness. (Tr. 58).

Based on the reasons which follow, the ALJ rejected Williams's testimony as not fully credible:

> The claimant testified that she had an initial stroke in June 2011 with resulting left sided weakness in her left leg and arm. The claimant also reported slurred speech secondary to the stroke. The claimant testified that since her stroke she has had a couple of falls secondary to her left knee buckling and persistent fatigue. The claimant reported that she also had another fall in a grocery store where she hit her head, and stated that she thought that was the result of another stroke sometime in 2012. The claimant testified that following these stroke events she participated in both physical therapy and speech therapy, which continued as of the date of the hearing. The claimant also described some syncope episodes with dizziness and passing out including a recent June 2013 episode where she passed out while in church. The claimant testified that she took prescribed medications faithfully, every single day only missing a dose if she was out somewhere, but taking the medication later (*See* Exhibit 18E, medications for hypertension and hyperlipidemia). The claimant reported medication side effects of sleepiness and drowsiness (Hearing Testimony).

>             \*                \*              \*

> At the hearing, the claimant testified that she was frustrated if someone rushed her on a task. In response to questioning regarding reported limitations in executive functioning or decision making, the claimant testified that sometimes in her mind said do this, but words either came out backwards or she could not formulate words. The claimant reported that she sometimes experienced confusion, which made her mad. The claimant reported feeling frustrated if she was doing something and her mind went blank (Hearing Testimony).

>             \*                \*              \*

> In addition to the above outlined testimony, the claimant reported that she had difficulty with running as she falls and had difficulty climbing and going down stairs.

The claimant testified that she could lift a gallon of milk with the left dominant arm, but only briefly (about a foot).  The claimant testified that she could do good with her right arm.  The claimant testified that sitting longer than an hour caused left leg numbness stating that the left leg would eventually freeze up such that she had to get up and walk around.  The claimant testified that her walking ability has not improved over the last year.  In response to questioning regarding references in the record to minimal compliance with a home exercise program, the claimant testified that she was doing exercises at the center, but denied performing stretching or walking assignments at home (Exhibit 9F-6 and Hearing Testimony).

The claimant testified that she remained on medications for hypertension, but her blood pressure still ran high.  The claimant testified that elevated blood pressure and extreme heat caused her to pass out.  The claimant reported that she sat on the floor with her back against something and stayed there until she felt better.  The claimant also stated that rising from sitting caused dizziness, but she was not dizzy if [she] stayed down.  The claimant stated that when she cooked she got everything she needed off lower shelves all at once, stating that repeated bending and getting back up mad[e] her dizzy.  The claimant testified that she could stand and walk without dizziness as long as she didn't nod her head up and down and kept her head straight (Hearing Testimony).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's alleged stroke residuals, the undersigned notes that overall the therapy records reflect progress.  Immediate post-stroke treatment records dated June 2011 showed normal sensation and normal extremity strength despite [] MRI findings consistent with stroke (Exhibit 1F-19).  Similarly, no focal neurologic deficits were identified in August 2011 or during the February 2012 consultative physical examination (Exhibits 2F and 3F as addressed above).  As of March 2013, the claimant reported feeling great with no dizziness (Exhibit 13F-2) and overall improvement was again noted in neurology follow up in May 2013 (Exhibit 15F-2).  Neurological findings from the May 2013 visits also reflect improved muscular strength (Exhibit 15F-4 as detailed above).  In addition, the objective medical record also reflects some non-compliance, both in terms of anti-hypertensive medications and home exercise program participation (Exhibits 7F-1, 7F-19, 7F-43, 9F-21, and 20F-17). (Tr. 13, 16, 19-20).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly.  Accordingly, this factor also

supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Laurie McQuade, a vocational expert ("VE"), at the hearing.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

The ALJ posed several hypothetical questions to the VE:

Q.  2.  okay.  All right.  And then the next hypothetical, again light work with that same limitation, occasional reaching with the left upper extremity with the additional limitation–is that right?

                    *                   *

Work is limited to simple routine repetitive tasks performed in a work environment free of fast-paced requirements involving only simple work-related decisions with few, if any, workplace changes.

Q.  Okay.  I want to make sure we got that.  All right.  And finally in the third hypothetical.  Again, light work, but due to a combination of medical conditions, associated pain, and mental impairments, the person is unable to engage and sustain work activity for a full eight-hour day on a regular and consistent basis.  Would this eliminate all jobs?

A.  yes.

Williams's counsel also posed several hypothetical questions to the VE.  (Tr. 66-70).

Williams argues that hypothetical question failed to take into account her well documented limitations in social functioning, left leg weakness with associated difficulty jobs, and fatigue, which preclude her from performing light work and the  type of jobs identified by the VE.  According to Williams, she is capable of sedentary work, and because of fatigue, her symptoms wax and wane.  The Commissioner counters that substantial evidence supports the ALJ's determination that Williams has the capabilities to perform light work with restrictions, and that the jobs identified by the VE are consistent with her RFC.  The Magistrate Judge agrees. The Fifth Circit has rejected the idea that the ALJ must in all cases make a separate finding that the claimant has the ability to maintain employment.  *See Frank v. Barnhart*,  326 F.3d 618, 619 (5th Cir. 2003).  Any such required extra finding must be predicated on the claimant having an impairment that waxes and wanes in its manifestation of disabling symptoms.  *See Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003).  The Fifth Circuit in *Dunbar* held that, "absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment work on a regular and continuing basis is inherent in the definition of" residual functional capacity, a separate finding regarding ability to maintain employment is not required.  *Id.* at 671.  "[I]t is not enough for a

claimant to assert, in general, that the impairment waxes and wanes; the claimant must demonstrate that [her] particular impairment waxes and wanes." *Tigert v. Astrue*, No.4:11-CV-435-Y, 2012 WL 1889694, at *7 (N.D.Tex. May 2, 2012). As discussed above, the ALJ found Williams's complaints of fatigue not fully credible. As for Williams's argument that the jobs of an usher and information clerk require a high reasoning level that exceeds her RFC, the job of a ticket taker is consistent with her RFC, and exists in sufficient numbers to support the ALJ's step five determination. The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. There is an accurate and logical bridge from the evidence to the ALJ's conclusion that Williams was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's step five finding. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Williams was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Williams was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As

such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 21) is  DENIED,

Defendant's Motion for Summary Judgment (Document No. 26) is GRANTED, and the decision of

the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 11th  day of February, 2016

Frances H. Stacy
United States Magistrate Judge